UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

───────────────────────────────

UNITED STATES OF AMERICA,                      S3 13 Cr. 923 (LAP)

                    Plaintiff,

        v.

LARRY DAVIS and
DCM ERECTORS, INC.,

                    Defendants.

───────────────────────────────

### MEMORANDUM OF LAW SUPPLEMENTING THE PENDING MOTIONS OF DEFENDANTS LARRY DAVIS AND DCM ERECTORS, INC. FOR A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND IN SUPPORT OF DEFENDANTS' RULE 33 MOTION FOR A NEW TRIAL

TALKIN, MUCCIGROSSO & ROBERTS, LLP

Sanford N. Talkin
Martha Grieco
40 Exchange Place 18th Floor
New York, NY 10005
Tel: (212) 482-0007

*Counsel for Larry Davis*


SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Kevin R. Puvalowski
Sarah E. Aberg
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700

*Counsel for Defendant DCM Erectors, Inc.*

# TABLE OF CONTENTS

**Page**

I.  A Judgment Of Acquittal Is Warranted Based On The Insufficiency Of The Trial Evidence, Or, In The Alternative, The Interest Of Justice Requires A New Trial ..............1

   A.  Legal Standard ..................................................................................................1

   B.  The Government's Evidence Is Insufficient To Make Out The Requisite Intent To Defraud..................................................................................................2

      a.  The Government's Evidence Of Defendants' Misrepresentations Is Insufficient ..................................................................................................3

      b.  The Port Authority Received The Benefit Of Its Bargain And Was Never Exposed To Unanticipated Financial Risk. ......................................5

      c.  The Evidence Clearly Demonstrates The Defendants' Good Faith Belief That They Were Doing Nothing Illegal. ..........................................7

II.  The Government Failed to Sufficiently Allege Intent to Defraud And Then Prejudicially Changed Its Theory Concerning Loss At Trial (All Counts) ......................16

   A.  The Indictment Itself Is Insufficient Because It Failed to Allege A Specific Intent to Defraud..................................................................................................16

   B.  The Government's Theory Concerning Harm to the Port Authority Changed Repeatedly and Prejudicially, Both From the Indictment and Throughout the Course of the Trial ....................................................................18

**INTRODUCTION**

Defendants Larry Davis ("Davis") and DCM Erectors, Inc. ("DCM") (collectively, the "Defendants") respectfully move this Court, pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure, for a judgment of acquittal or a new trial.

**I.     A Judgment Of Acquittal Is Warranted Based On The Insufficiency Of The Trial Evidence, Or, In The Alternative, The Interest Of Justice Requires A New Trial**

**A.     Legal Standard**

The Federal Rules of Criminal Procedure require a Court to "to enter a Judgement of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a).  A judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 must be entered if no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (citing *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  A criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one.  *See, e.g., United States v. Samaria,* 239 F.3d 228, 233 (2d Cir. 2001); *United States v. Nusraty,* 867 F.2d 759, 765-67 (2d Cir. 1989).  A reviewing Court should defer to a jury's assessments with respect to credibility, conflicting testimony, and "the jury's choice of the competing inferences that can be drawn from the evidence," *Samaria,* 239 F.3d at 233 (quoting *United States v. Morrison,* 153 F.3d 34, 49 (2d. Cir. 1998).  However, specious inferences should not be credited.  *See United States v. Gore,* 154 F.3d 34, 40 (2d Cir. 1998).  "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).

In considering a motion to vacate pursuant to Federal Rule of Criminal Procedure 33, the Court's discretion is much broader than under a Rule 29 analysis. The Court may "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33. A district court must determine whether "it would be a manifest injustice to let the guilty verdict stand." *United States v. Sanchez,* 969 F.2d 1409, 1414 (2d Cir. 1992) (quoting *United States v. Reed,* 875 F.2d 107, 114 (7th Cir. 1989)). The Court must find that the verdict is supported by "competent, satisfactory and sufficient" evidence. *Id.* Of course, in analyzing the evidence at trial, the Court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses." *United States v. LeRoy,* 687 F.2d 610, 616 (2d Cir. 1982), *cert. denied,* 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983). Nonetheless, the Court should grant a new criminal trial if there is "a real concern that an innocent person may have been convicted." *United States v. Parkes,* 497 F.3d 220, 232 (2d Cir. 2007) (quoting *United States v. Ferguson,* 246 F.3d 129, 134 (2d Cir. 2001)).

### B. The Government's Evidence Is Insufficient To Make Out The Requisite Intent To Defraud

In order to meet its burden to prove a wire fraud violation, the government must prove three essential elements: "'(1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of the [] wires to further the scheme.'" *United States v. Shellef,* 507 F.3d 82, 107 (2d Cir. 2007) (quoting *Fountain v. United States,* 357 F.3d 250, 255 (2d Cir. 2004), cert. denied, 544 U.S. 1017 (2005)). In proving the requisite scheme or artifice to defraud, the government must show that the Defendants "possessed a fraudulent intent." *United States v. Novak,* 443 F.3d 150, 156 (2d Cir.), cert. denied, 549 U.S. 997 (2006) (citing *United States v. Starr,* 816 F.2d 94, 98 (2d Cir. 1987)). This means that, "at a minimum," the government must "prove that defendants contemplated some actual harm or injury to their victims. Indeed, a

showing of intended harm will satisfy the element of fraudulent intent." *Id.* (internal quotations omitted). "Schemes that do no more than cause their victims to enter into transactions they would otherwise avoid . . . do not violate the mail or wire fraud statutes." *Shellef*, 507 F.3d at 108. Thus, application of the wire fraud statute has been "repeatedly rejected where the purported victim received the full economic benefit of its bargain," and there has been no showing that "the deceit affected the victim's economic calculus or the benefits and burdens of the agreement[,] . . . the defendants' misrepresentations pertained to the quality of services bargained for[,]" or exposed the victim to "unexpected financial risk." *United States v. Binday*, 804 F.3d 558, 570-71 (2d Cir. 2015).

Here, the government has failed to present evidence on several issues. First, there is no evidence that either defendant made a misrepresentation of any kind to the Port Authority of New York and New Jersey (the "Port Authority"). Second, the record is clear that the Port Authority received the benefit of its bargain with DCM and Mr. Davis, and that any alleged "deceit" on the part of the Defendants had no impact on the Port Authority's economic calculus or exposed it to unanticipated financial risk. The Port Authority's own witness testified that DCM's work was completed, that the work itself was "skilled" and "satisfactory," and that DCM was entitled to the additional payments it received above the original contract prices for its work at One World Trade Center ("1WTC") and the World Trade Center Transportation Hub ("Hub"). Third, the evidence clearly demonstrates the Defendants' good faith belief that they were doing nothing illegal.

### a. The Government's Evidence Of Defendants' Misrepresentations Is Insufficient

The government has completely failed to prove that the Defendants made any misrepresentations to the Port Authority. The government alleged that DCM's participation

plans submitted for both the World Trade Center ("WTC") Tower One and the Port Authority Trans Hudson Transportation Hub ("Hub") misrepresented the involvement of Solera/DCM joint venture ("Solera/DCM") and GLS Enterprises, Inc. ("GLS"). However, there is no evidence whatsoever as to who prepared the plans, who submitted the plans on behalf of DCM, or whether anyone involved in creating and/or submitting those documents had knowledge of falsity or any intent to defraud. There is certainly no evidence that Davis prepared or submitted these plans. Absent any evidence as to the creation of the plans, what knowledge and intent the anonymous drafter had and how they came into the possession of the Port Authority, there is no possibility of sufficiently connecting them to either Defendant. Furthermore, there is no evidence that these plans had any bearing on the award of either contract. There is no dispute that the dates on the participation plans that have been entered into evidence all postdate the awards of their respective contracts. Therefore, even were they to contain misrepresentations, and those misrepresentations could in turn be attributed to the Defendants, they would amount to no more than unactionable (and innocuous) "deceit" under *Shellef.* 507 F.3d at 108; *see also United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181 (2d Cir. 1970) ("[A]n intent to deceive, and even to induce, may have been shown; but this does not, without more, constitute the 'fraudulent intent' required by the statute. If there is no proof that the defendants expected to get something for nothing, or that they intended to get more for their merchandise than it was worth to the average customer, it is difficult to see any intent to injure or to defraud in the defendants' falsehoods.").

Likewise, the Statements of Payment ("SOP") and the Certified Payrolls ("CPR") contained no inaccurate information. The SOPs reported four items for each listed company: 1) the award amount; 2) the amount paid for the current period; 3) the amount paid to date; and 4)

an indication of whether the company was "WBE" or "MBE." There is no evidence in the record that any of this information was false in any way. The CPRs list the name of the contractor or subcontractor, the individuals working for that contractor at the site, and the hours and earned wages for those individuals. Neither the SOP nor the CPR make any claim for minority business credit, nor do they state the work for which payment is being sought. MBE "credit" is something the Port Authority determines on its own; the information on the SOPs is simply how much money is being paid to subcontractors and what their status is with regard to MBE. T108:2-15. Again, none of the information on these documents was false in any way — there has certainly been no evidence admitted or testimony solicited that would even suggest otherwise — and even if misrepresentations existed in the SOPs and CPRs, there is no evidence that they could have even remotely caused the Port Authority to suffer any economic harm whatsoever.

> **b.** **The Port Authority Received The Benefit Of Its Bargain And Was Never Exposed To Unanticipated Financial Risk.**

There was also no evidence at trial that, had any of the alleged misrepresentations actually been made, that they would have had any economic impact on the Port Authority or its ability to make informed economic decisions. No representative from the Port Authority was able to identify any economic impact that could or did result from the Defendants' alleged use of Solera/DCM and GLS as "pass-throughs." Ida Perich, the general manager of the Port Authority's Office of Business Diversity and Civil Rights, without specifying either Defendant, testified only that the "use of pass-throughs jeopardizes the integrity of the program, of who this program is targeting to help, minority and women-owned programs." T98:20-24. She further stated that her office monitors the "MBE effort" at the site, and collects reports from the contractors as part of this monitoring. T88:14-89:11. Ms. Perich testified that these reports are

"ultimately" compiled into an annual report for the Port Authority Board of Directors regarding "how well the agency met its commitment of contracting 12 percent with minority-owned businesses and 5 percent with women-owned businesses." T89:5-11. Even if the jury believed there was a misrepresentation, the misrepresentation was "not directed to the quality, adequacy or price of goods to be sold, or otherwise to the nature of the bargain." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1179 (2d Cir. 1970). Thwarting a general desire to assist minority and women businesses and making a section of an annual board report somewhat less reliable simply does not constitute the kind of economic harm that is criminalized under the wire fraud statute.

On direct examination, Alan Reiss, the Port Authority's Director of World Trade Center Construction, testified only that if a "pass-through" came to Port Authority's attention, it would be referred to the "office of inspector general," but did not elaborate any further. T149:11-20. Mr. Reiss also testified that the Port Authority paid DCM nearly $150 million more than its original WTC Tower One contract price (T167:15-17), and $220 million more than its original Hub contract price (T174:25-175:2). However, notwithstanding arguments made by the Government to the contrary, as discussed below, there was no testimony by Mr. Reiss or any other witness that any of these extra costs were a result of, or even connected to, alleged misrepresentations made by the Defendants regarding DCM's minority and women participation goals. Indeed, on cross examination, Mr. Reiss clarified the true reason for these extra costs — namely, that the Port Authority asked DCM and Davis to perform extra work. T184:1-21. On redirect examination, Mr. Reiss actually identified the precise causes of the extra work needed: the Port Authority's requested changes to the building plans, construction delays, bad weather (including record snowstorms and Hurricane Sandy), redesign of the 9/11 Memorial, issues with

the intumescent paint, and delays in getting curved steel from a vendor in Europe. T210:6-211:18. There was no suggestion that any of these extra costs were linked to DCM's MBE goals, or to any alleged misrepresentations regarding those goals. Mr. Reiss also testified that DCM completed the work it was hired to do, and that "DCM was building the building satisfactorily. They had a skilled crew." T184:22-23; T188:25-189:9. In short, Mr. Reiss's testimony makes it crystal clear that the Port Authority received the benefit of its bargain with the Defendants, and did not and could not have suffered any economic harm as a result of the Defendants' alleged misrepresentations.

### c. The Evidence Clearly Demonstrates The Defendants' Good Faith Belief That They Were Doing Nothing Illegal.

"Good faith is a complete defense to a mail fraud charge." *United States v. Alkins*, 925 F.2d 541, 549 (2d Cir. 1991); *see also United States v. Knight*, Nos. 09-5195-cr (L), 09-5198-cr (con), 09-5336-cr (con) (2d Cir. Feb. 1, 2012) (affirming jury instruction that "good faith on the part of a defendant is a complete defense to a charge of mail or wire fraud."). Here, the evidence presented at trial demonstrates that the Defendants acted in good faith and were fully transparent with the Port Authority. It is uncontroverted that Defendants disclosed the involvement of AC Associates and the transfer of the surveyors from DCM's payroll to GLS's payroll to the Port Authority shortly after the project began. Moreover, testimony from the Government's two cooperating witnesses confirmed that the Defendants acted in good faith. Gale D'Aloia's own testimony about her state of mind at the time of the alleged conspiracy — testimony corroborated by statements Ms. D'Aloia made to the Port Authority — demonstrates that there simply was no conspiracy to defraud. On cross examination, Defendants confronted Johnny Garcia with numerous emails plainly indicating that Mr. Garcia was doing work for the joint venture.

The Government's attempts to undermine this evidence were without support. The government argued that Mr. Garcia did not actually do any work for the WTC projects, T973:17-20, but the documentary evidence, consisting mainly of emails written contemporaneously with the alleged conspiracy, proved just the opposite. In reality, Mr. Garcia traveled around the world on behalf of the joint venture to observe testing of glass technology in China, fabrication of steel for the Hub in Spain, and fabrication of the metal deck in Pittsburgh and New Jersey. T284:8-13. Garcia brought his own employees — Javier Ronquillo and Arturo Santos — along with him to Pittsburgh. *Id.* These employees were legitimate employees of the joint venture that Garcia himself hired to do real work. Mr. Santos' job, Mr. Garcia stated, was to be "on the site helping DCM project managers." T285:22-23. Mr. Garcia explained that he — and he alone — hired Mr. Ronquillo in 2010, yet tried to gloss over this fact by claiming that Mr. Ronquillo was hired for the sole purpose of visiting the WTC sites to show the Port that there were Solera personnel on site. T285:7-10. This argument makes no sense: why hire and pay someone to visit the construction sites when Mr. Garcia himself could have done so? Rather, the evidence makes clear that the far more reasonable explanation is that Messrs. Ronquillo and Santos were hired for a legitimate business purpose.

Cristina Huguet, Mr. Garcia's niece, was another legitimate hire. Ms. Huguet was a qualified architect living in Spain, where the Hub steel was being fabricated. Mr. Garcia testified on direct:

> In one of the meetings that I had with Mr. Davis at his office, he was saying that we need personnel for this project. I suggested that my niece, she is a registered architect and she lived in Spain, Barcelona, I suggest that it would be great work for her so she can be participating in this unique project, and it wouldn't be too much for her to travel back and forth.

T294:10-16. Mr. Garcia confirmed that Ms. Huguet "was working to make sure the quantities for the material that have to be sent from Spain to the States was accurate, the scheduling as well." T294:21-23. He furthermore testified that he interviewed others outside his family for jobs with the joint venture, including Bill Cooper, who was eventually hired by Mr. Garcia to head the joint venture's purchasing department. *See* Def. Ex. A141, T424:23-25 - T425:1-5. Far from the Government's contention that Garcia's construction company "was run by a one-man shop out of his house," the trial evidence actually showed that Solera employed at least seven people, three of whom worked directly at the WTC sites. T44:18-23.

For example, Mr. Garcia's claim that he had no control over the hiring of personnel was contradicted at trial by documentary evidence proving otherwise and internal inconsistencies. There is no dispute that Mr. Garcia hired his daughter, Stefanie, to work for Solera Construction during the alleged conspiracy time period. When questioned repeatedly about whether Stefanie Garcia's work was real or fake, however, Mr. Garcia avoided answering directly and instead left his testimony as contradictory. On cross examination, Mr. Garcia admitted that he or his daughter attended over 40 meetings on behalf of the joint venture regarding construction of the "podium wall," or first 20 floors of WTC Tower One. T406:20-25; T409:22-24. He further admitted on cross examination that Stefanie took notes at meetings and sent emails on her father's behalf. T541:20-23. When asked whether Stefanie's work was fake, and thus she was part of the fraud, Mr. Garcia refused to concede this, saying he could not answer or did not know. T541:24-25 – T542:1-6. Stefanie's work, of course, was real — and she believed it to be real — because Solera was a legitimate company that actually worked on the WTC sites.

Not only did his employees do real work, they reported their work directly to Mr. Garcia. Defendant's A140, a 124-page document, contains years' of monthly reports Bill Cooper

prepared and sent to Mr. Garcia updating him on the joint venture purchase orders. T426:22-25. Mr. Garcia clearly viewed Mr. Cooper as his employee, not somebody who was simply placed on Solera's payroll for appearances; in an email to Davis about Davis assigning Cooper a task, Mr. Garcia complained, "Larry. Please, next time advise me before you consult or request any information from *my staff*." Def. Ex. A148 (emphasis added). In an email to John Scott, a DCM Erectors project manager, about problems with steel production in Spain, Mr. Garcia wrote that *his* "people" were updating him daily on the progress in Spain, making him aware of the problems. Def. Ex. A209, T536:4-7.

In fact, Mr. Garcia monitored the work so closely in Spain that he knew, on a given day, how many ships bringing the steel for the Hub roof were supposed to be departing Europe for the U.S. Def. Ex. A219; T544:2-25 - T545:1-16. When a ship full of steel bound for the U.S. was delayed in England because of payment issues, it was Mr. Garcia whom Cristina Huguet phoned to help resolve the issue. Def. Ex. A225; T546:1-24. Huguet emailed Mr. Garcia, and Mr. Garcia alone, with updates on the steel in Spain, which Mr. Garcia then forwarded to Larry Davis. Def. Ex. A128. Mr. Garcia was the Spanish steel company's primary point of contact, and it was Mr. Garcia who wrote letters to them trying to resolve shipment and delivery scheduling problems. Def. Ex. A110. When the steel pieces arrived from Spain, Mr. Garcia further testified that he went to the warehouse in New Jersey where the steel was being stored to look at it. T296:14-18.

The Government's contention that Mr. Garcia did absolutely nothing but collect checks was contradicted by uncontroverted evidence on numerous other occasions throughout the trial, including both direct and cross examination of Mr. Garcia. Mr. Garcia interacted with suppliers to obtain material pricing and negotiated a reconciliation of amounts owed with the supplier.

Def. Ex. A140; T415:10-18. Mr. Garcia was also a contact person for environmental compliance. Def. Ex. A144; T420:18-20. Mr. Garcia solicited business for the joint venture in his native Ecuador where there are absolutely no affirmative action requirements. *See* Def. Ex. A153; T422:2-12. Mr. Garcia attended networking events seeking commercial opportunities for the joint venture. T554:11-12. Mr. Garcia traveled to China on behalf of the joint venture to observe tests done on the glass that was to encase the podium wall, took videos and photos of the tests and conveyed the results to his joint venture partner, Larry Davis. T434:2-16.

Throughout the trial, the Government repeatedly misled the jury about the norms of the construction industry. In its opening statement, the Government told the jury that the fact that D'Aloia did no surveying herself was evidence of the fraud. T48:10-12. The jury also heard that Mr. Garcia was not on site installing metal deck himself. The iron workers and surveyor who testified for the Government, however, unanimously confirmed that it is the union members who actually perform the labor of reconstructing the WTC sites piece by piece, not the construction company owners. Mr. Garcia admitted that supervision of the laborers, furthermore, is done by union member foremen in the field, not by construction company owners. T504:9-11.

The jury was also presented with a "red herring" regarding the plan to transfer Solera employees from Solera's payroll to the JV's payroll. Mr. Garcia testified that during his recorded conversation with Mr. Davis (which occurred in November 2011, right in the middle of the conspiracy period), Mr. Davis explained that he could not pay his subcontractors, including Solera/DCM, because the Port Authority was not paying DCM, and that Mr. Davis planned to inform the Port Authority that Solera employees would be put on the Solera/DCM payroll so they would have a better chance of getting paid. T497:3-T498:9. This plan was not fraudulent, deceptive or in any way against Port Authority rules. Indeed, Mr. Garcia admitted as much on

the cross examination that Mr. Davis' proposed solution was going to be "run by the Port Authority in full transparency." T498:17-21.

In the course of his cooperation, Mr. Garcia pleaded guilty to numerous other frauds having nothing to do with Mr. Davis in which he acted as a pass-through for other construction companies on public projects with MBE requirements. Clearly, Mr. Garcia faced many years in prison and had everything to gain by testifying for the Government, rewriting his history with Solera/DCM, and falsely stating that all of the work he and his employees did for the joint venture — hiring personnel, traveling, soliciting business, interfacing with the Port Authority, negotiating material pricing, working with the Spanish steel fabricator, drawing up purchase orders — was only to create the *appearance* that he was a legitimate business owner. To use the Government's own adage: if it quacks like a duck, and walks like a duck, it's a duck. Mr. Garcia admitted to doing all of the above-mentioned work, but he *characterized* it as fake, as part of a show supposedly performed to defraud the Port Authority. Mr. Garcia's opinion that this work was fake, endorsed by the Government, is simply not evidence beyond a reasonable doubt that the Defendants committed wire fraud.

Gale D'Aloia, on the other hand, was charged only with fraud related to her conduct as a subcontractor for Defendants. Ms. D'Aloia testified unequivocally that she did not intend to defraud the Port Authority when she contracted with Defendants to do surveying work, and she did not believe Mr. Davis intended to defraud the Port Authority; in fact, she admitted that the government had convinced her she had committed a crime:

Q: Isn't it a fact that they convinced you during that interview that you just didn't do enough to supervise them? Isn't that true?

A: Yes.

Q: Before that day, Ms. D'Aloia, isn't it true that you thought what you were doing was perfectly fine?

A:  Yes.

T809:15-810:19.  Even up to her guilty plea, she continued to believe that her arrangement with

DCM to transfer surveyors to her payroll did not defraud the Port Authority.  T811:7-10.  This

makes sense, based on the evidence presented at trial regarding the work she actually did to

manage the surveying operation.  There was no dispute that Ms. D'Aloia's business, GLS

Enterprises, was a legitimate WBE for payroll management services and that this was

Ms. D'Aloia primary expertise, having managed payroll for various companies since 1980.  The

idea to expand her business, Ms. D'Aloia testified, came from Mr. Davis, who suggested that

because she also had a background in engineering and drafting, she could manage that portion of

the Goldman Sachs contract in addition to payroll, and Ms. D'Aloia agreed, hoping to use the

experience to gain certification as a WBE for drafting and engineering.  T685:24-25.

Ms. D'Aloia stated that the reason Mr. Davis suggested this to her was so that Mr. Davis could

obtain WBE "credit."  T684:19-22.  There is nothing untoward about seeking WBE credit — in

fact, the Port Authority encouraged prime contractors to break off pieces of the work the prime

could otherwise do and subcontract them out to smaller M- and WBEs.  T72:24-25.  One of the

purposes of the affirmative action program was to increase the experience of women-owned

businesses in the construction industry, and that is exactly what Defendants did with respect to

Ms. D'Aloia's business.

 The evidence showed that at the time this plan was conceived, D'Aloia had no intent to

defraud Goldman Sachs.

 Q. [ …] What was your involvement with the engineering-drafting work of ASDA?  Did
you have any?

 A.  Originally, I was going to be going to Toronto and meeting with Gary Decock and the
drafters, and I did for a while.

T686:11-14.  She actually intended to manage the drafting and engineering work at Goldman Sachs when she began the venture and was confident that she could handle it.  T697:14-19.  She testified that that was her understanding of Mr. Davis' intentions as well.  T766:2-10.  She testified that the drafting work at the WTC sites entailed thousands of drawings, and that she managed the communication among ASDA, ASDA's own subcontractors, the architects and the owners.  T736:14-25 – T737:1-15.  Given not only her engineering background, but also her history with the people at ASDA going back 30 years, Ms. D'Aloia was an ideal person to manage this aspect of the work.  T738:3-14.

The evidence, at worst, showed that Ms. D'Aloia herself overstated her surveying, engineering and drafting experience in her application to the Port Authority for certification as a woman-owned business in those fields.  T701:7-25 – T702:1-7.  However, GLS Enterprises never was certified by the Port Authority for those business specialties.  T704:7-11 and T804:9-12. The Government presented absolutely no evidence that Mr. Davis or anyone from DCM directed Ms. D'Aloia to exaggerate her skills, and the Defendants received no benefit whatsoever from her attempted certification.  There was absolutely no evidence presented, and the Government did not argue, that Defendants falsely told the Port Authority that GLS Enterprises was a certified woman-owned surveying business.  Tellingly, despite not receiving WBE "credit" for GLS Enterprises in the areas of drafting, engineering and surveying, DCM did not cancel its contracts with GLS Enterprises for those portions of the work.

Regarding GLS Enterprises' surveying work, Ms. D'Aloia's direct testimony revealed that she did plenty of work to manage the surveyors.  She interfaced with the GPS system subcontractor, Leica, and trained in how to use the novel technology.  T711:4-11.  She purchased two laptops for the surveying work, and applied for a line of credit to purchase surveying

equipment. T711:16-19. She dealt with insurance and security key access for all of GLS' employees, which she truthfully testified were complex undertakings at the WTC sites. T771-772. After transferring the surveyors to her payroll, any additional surveyors that needed to be hired from the union hall were chosen by the union foreman and superintendent, Chuck Kossuth and Kevin Murphy, respectively, "because they knew who were [sic] good." T712:1-4. Ms. D'Aloia herself had known most of the surveyors for a long time anyhow, thus obviating the need for any formal interviews. T745:2-10. It was clear from her testimony and that of the veteran surveyor who testified for the government — Michael Kossuth — that surveying, like metal deck installing and iron welding, is done by members of the union and supervised by a foreman from the union. When the surveyors made their measurements and conveyed to the various other tradesmen the appropriate angles and other technical information in order to keep the building level as it went up, there was no reason for Ms. D'Aloia or anyone else to get in the middle of that flow of information. T744:1-9.

In 2013, after the WTC sites were complete in terms of surveying, Ms. D'Aloia convened her surveyors to discuss moving forward as a surveying company, possibly bidding for other work. After this meeting, Ms. D'Aloia abandoned the idea because she did not have a surveying license, which, though not required, was good for generating business. T729:11-19. Ms. D'Aloia explained frankly on cross examination that, just as with engineering and drafting, it was always her and Mr. Davis' intention that she would *actually* manage these aspects of the construction contract. T768:2-7. This reality was most obviously displayed when the jury heard the audio recording of Ms. D'Aloia answering questions from a person who purported to be from the Port Authority, long before she knew of any criminal investigation. Ms. D'Aloia guilelessly told the representative who identified himself as from the Port Authority — the agency the

Government claims Ms. D'Aloia was deliberately conspiring to defraud — that she subcontracted out all of the drafting and engineering work to ASDA. Def. Ex. D10; T800:17-25. Before she knew of any criminal investigation, Ms. D'Aloia openly told the Port Authority that her surveyors, whom she hired once receiving a subcontract from DCM, had been transferred from DCM's payroll to hers. Def. Ex. D21; T805:17-25. This was not a secret, and the fact that it was not a secret shows that it is not evidence of fraudulent intent. T806:4-9.

This evidence irrefutably demonstrates Defendants' good faith belief that they had nothing to hide from the Port Authority and were making their best efforts to meet their contractual MBE obligations. There was simply nothing before the jury that could reasonably lead them to conclude that Mr. Davis conspired with Mr. Garcia and Ms. D'Aloia to commit fraud. In fact, with respect to Ms. D'Aloia, her testimony was she and Mr. Davis contemplated that Ms. D'Aloia would actually manage the drafting, engineering and surveying aspects of her business. Ms. D'Aloia, in effect, testified that there was no conspiracy to defraud. This was not a case where the jury weighed the credibility of witnesses and found in favor of the Government. There simply was no evidence of any lack of good faith or intent to defraud on the part of Defendants. Allowing the verdict to stand in this case would be a manifest injustice.

## II. The Government Failed to Sufficiently Allege Intent to Defraud And Then Prejudicially Changed Its Theory Concerning Loss At Trial (All Counts)

### A. The Indictment Itself Is Insufficient Because It Failed to Allege A Specific Intent to Defraud

The fact, as discussed above, that the trial evidence was insufficient as to the element of intent to defraud is not surprising given that this fatal insufficiency originated with the charging document itself. Indeed, the Indictment makes clear that the Government failed to appreciate what had to be proven with respect to intended harm from the outset of the case.

The law is clear that "[a] criminal defendant is entitled to an indictment that states the essential elements of the charge against him." *United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) (citing *Jones v. U.S.*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974)). As the Court correctly instructed, a necessary element of wire fraud is that the defendant "participated in the scheme to defraud knowingly, willfully, *and with specific intent to defraud*." (Jury Charge at 24 (emphasis added).) As the Court further instructed, "[t]o act with intent to defraud means to act knowingly and with the specific purpose of causing some financial harm or deprivation of property to the Port Authority." (Jury Charge at 24-25.)

We submit that the Indictment in this case demonstrates that the Government simply never appreciated the core of the intent to defraud requirement: the Indictment not only completely failed to allege (expressly or by reasonable inference) that the Defendants contemplated financial harm to the Port Authority, when the Indictment mentioned harm to the Port Authority at all, such harm was entirely non-economic. The Indictment alleges, for example, that DCM "fraudulently claimed MBE credit for One WTC and the WTC Hub in excess of $70 million based on the value of work Solera/DCM purportedly performed for the World Trade Center Project" and "fraudulently claimed WBE credit for $6.3 million of surveying and payroll management work GLS purportedly was performing as a subcontractor to DCM on One WTC and the WTC Hub." (Dkt. No. 38 at ¶¶ 12, 15.) There is no other alleged harm (actual or contemplated) to the Port Authority alleged in the Indictment. Moreover, at no point in the Indictment (or at trial, for that matter) was there any assertion or proof that the provision of such MBE or WBE "credit" had any economic impact on the Port Authority or how fraudulently obtaining such credit could even theoretically cause "financial harm" or "deprivation of property." There is certainly no allegation that can be reasonably read to allege that the

Defendants intended to cause the Port Authority any *financial* harm by obtaining such credit. Without such an allegation that the Defendants intended to cause the Port Authority some cognizable economic harm, the Indictment fails to allege a requisite element of the wire fraud offence and must be dismissed.

### B. The Government's Theory Concerning Harm to the Port Authority Changed Repeatedly and Prejudicially, Both From the Indictment and Throughout the Course of the Trial

Even if the allegations concerning MBE and WBE "credit" in the Indictment could be reasonably read to have sufficiently alleged intent to defraud, the Government substantially expanded its theory of loss at the beginning of trial — adding to its "credit" theory an assertion that the Defendants failed to finish the WTC and Hub projects for the agreed-upon contract prices because of the alleged fraud, and thereby allegedly caused the Port Authority to pay Defendants hundreds of millions of dollars more than the original contract price. By doing so, the Government very substantially expanded the scope of the charges, for the first time and without any prior notice. Indeed, after that new theory was itself dismantled by the testimony of a Port Authority witness, by the time of closing arguments, the Government changed the focus of its theory of loss once again and relied upon payments made by the Port Authority of a few thousand dollars to Johnny Garcia for his own time. Moving the proverbial goalposts over and over in this way greatly prejudiced the Defendants and constitutes constructive amendment of the Indictment or a prejudicial variance that requires dismissal.

The theory of "constructive amendment" is based on the fundamental principle that "after an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960). "To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is

uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment." *United States v. Salmonese,* 352 F.3d 608, 620 (2d Cir. 2003) (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998); *see also United States v. Laspina*, 299 F.3d 165, 181 (2d Cir. 2002). Although the Court must permit "significant flexibility in proof," the defendant must be provided with "notice of the core criminality to be proven at trial." *United States v. Laspina*, 299 F.3d at 181 (quoting *United States v. Delano*, 55 F.3d 720, 729 (2d Cir. 1995)). A constructive amendment is a *per se* violation of the Fifth Amendment, *Laspina,* 299 F.3d at 181, and constructive amendments have been found when the government alleges one theory of the case in the indictment but argues another at trial. *See, e.g., Stirone v. United States*, 361 U.S. at 217 (proof of interference with interstate shipment of steel from Pennsylvania was constructive amendment of indictment that alleged interference with shipment of sand into Pennsylvania); *United States v. Salinas*, 654 F.2d 953 (5th Cir. 1981) (indictment alleging aiding and abetting theft by named bank official was constructively amended by proof showing that defendant aided and abetted another official), *overruled on other grounds by United States v. Adamson*, 700 F.2d 953 (5th Cir. 1983).

The theory of "variance" is related to constructive amendment and "occurs when the charging terms of the indictment are left unaltered, but the evidence offered at trial proves facts materially different from those alleged in the indictment." *United States v. Salmonese,* 352 F.3d at 621 (quoting *United States v. Frank*, 156 F.3d at 337 n.5). "Unlike constructive amendment, a variance 'does not broaden the possible basis for conviction beyond that contained in the indictment.'" *Laspina,* 299 F.3d at 183 (quoting *United States v. Patino,* 962 F.2d 263, 266 (2d Cir. 1992). "Accordingly, a defendant must show that the variance resulted in 'substantial prejudice' in order to obtain relief from his conviction." *Id.* (quoting *United States v.*

*McDermott*, 245 F.3d 133, 139 (2d Cir. 2001)). "To decide whether a variance is prejudicial, the court must decide 'whether the variance infringes on the 'substantial rights' that indictments exist to protect — 'to inform an accused of the charges against him so he may prepare his defense and to avoid double jeopardy.'" *United States v. Ortiz,* 666 F. Supp. 2d 399, 403-04 (S.D.N.Y. 2009).

Here, whether it is viewed as a constructive amendment or as a prejudicial variance, the Government's ever shifting theory on a crucial element of the case — the contemplated economic harm necessary to support an intent to defraud — requires dismissal. The record shows the shifts in the Government's loss theory:

- As noted above, the March 2016 Superseding Indictment itself alleged that the Defendants "fraudulently claimed MBE credit for One WTC and the WTC Hub in excess of $70 million" (Ind. ¶ 12), and "fraudulently claimed WBE credit for $6.3 million of surveying and payroll management work GLS purportedly was performing." (Ind. ¶ 15.) No other factual allegations concerning loss to the Port Authority are included in the Indictment.

- The Government's motion in limine filed in April 2016 parrots the Indictment language, and the only recitation of loss to the Port Authority mentioned was the $70 million MBE "credit" and the $6.3 million WBE "credit." (Docket No. 42, at 3-4.)

- In its opening statement, the Government continued to argue that the Defendants fraudulently claimed "credit." T. 45:22-25. Perhaps realizing at last that the allegedly fraudulent credit was insufficient, the Government also added a new theory of economic harm that was found nowhere in the Indictment and had never been argued before that moment: "You'll also learn that while paying all these kickbacks to people who were not doing any actual work, kickbacks the Port Authority didn't know about, Davis and DCM couldn't finish these projects for the agreed-upon price. The Port Authority ended up paying Davis and DCM hundreds [of] millions of dollars more than the original contract price to get the Freedom Tower and the hub done." T. 46:21-47:2.

- During the Government's case, the Government attempted to prove up the theory that amounts paid over the original contract price were caused by the alleged MBE and WBE fraud. As discussed above, however, the Government's own witness, Mr. Reiss, definitively discredited that theory and confirmed

unequivocally that DCM was only paid for work that was actually done on the project. T. 184:5-9, 22-23.

- Despite Mr. Reiss's abject renunciation of its theory, while arguing the Rule 29 motion at the close of its case, the Government continued to press its argument that the alleged MBE and WBE fraud caused the Port Authority to spend more money than it would have. T. 931:25-932:1; 933:11-934:4. After Defendants made clear, however, that the evidence demonstrated that the profits and overhead charges that the Government was relying upon were *not* passed onto the Port Authority, even after the WTC contract was converted to a time and materials contract, T. 936:12-937:7, the Government shifted yet again, this time relying on a few occasions when Mr. Garcia's own time was listed on certified payrolls paid by the Port Authority: "I believe on the Solera/DCM invoices, Mr. Garcia at some point was listed." On the CPR, certified payrolls and certain of his family member employees were listed. T. 937:9-12. The Indictment of course contained no allegation about the Port Authority suffering economic harm because Johnny Garcia was "at some point listed" on a few certified payrolls, and the Government had not articulated this as a basis for its theory on contemplated financial harm until making this argument after the close of its case.

- During its closing, the Government continued to press the argument it first made during its opening that the amounts paid in excess of the agreed-upon contract price resulted from the alleged MBE and WBE fraud, despite Mr. Reiss's unequivocal rejection of that notion. T. 1004:25-1105:10. In addition, however, the Government also relied expressly on the argument first made during the Rule 29 colloquy concerning Johnny Garcia's own time appearing on a few certified payrolls: "Here's an example of a certified payroll showing that Johnny Garcia was on the payroll. These are the payrolls that were sent to the Port Authority." T. 1006:9-11.

The record thus plainly establishes that the Government's theory of contemplated

economic harm, a required, central element of the charged offense, went from a (plainly

deficient) notion of fraudulently obtained "credit" in the Indictment, to a notion first articulated

on opening that the Port Authority paid hundreds of millions of dollars of cost overruns due to

the alleged fraud, to a notion that the Port Authority paid a few thousand dollars because Johnny

Garcia's own time was listed on a few certified payrolls. This repeated shifting of position, on a

critical, disputed element, requires dismissal.

First, we submit that the Government's reliance on the argument that the alleged fraud caused the Port Authority to pay hundreds of millions of dollars more than the agreed upon contract prices is a very substantial, and constitutionally impermissible, expansion of the Indictment that the Grand Jury actually handed down. There is no mention whatsoever of the alleged extra amounts paid above the agreed-upon contract price in the Indictment. Indeed, at least in the Grand Jury transcripts that were turned over to the defense in 3500 material, there is no mention of such extra payments even in the Grand Jury testimony. The simple fact is, linking hundreds of millions of dollars in cost overruns to the alleged fraud changes, indeed, very substantially *expands*, the alleged element of contemplated economic harm as compared to anything that can reasonably be read into the Indictment. That expansion of a required element of the offense was never voted upon by the Grand Jury and therefore constitutes a constructive amendment that mandates dismissal of the Indictment as a matter of law.

Even if the Government's shifting theories on economic loss did not constitute a constructive amendment, it should still be viewed as a prejudicial variance. By making the argument in its opening statement that the extra amounts paid to DCM by the Port Authority over and above the agreed-upon contract amounts resulted from the alleged fraud, the Government unexpectedly and very directly put into issue years' worth of factual detail relating to millions of dollars of claimed change orders, force orders and other required additional work — work that ended up being the subject of numerous court proceedings in New Jersey. Although the defense was able to extract several very useful (and we think dispositive) admissions from Mr. Reiss on this issue during cross-examination, had those allegations been contained in the Indictment, the Defendants would have been able to prepare in detail to prove definitively that the additional funds sought and obtained from the Port Authority were entirely legitimate and justified and had

nothing whatsoever to do with the alleged fraud. Not only would we have had an opportunity to collect and analyze the massive amount of paperwork relating to change orders in order to disprove the Government's theory through documentation, we would have had an opportunity to more fully obtain and exploit evidence relating to the New Jersey court proceedings at which these cost overages were repeatedly litigated (and resolved in the Defendants' favor). Similarly, had the Indictment alleged that the Port Authority suffered economic harm as a result of the fact that Johnny Garcia's own time appeared on a few certified payrolls — an issue that was expressly raised by the Government only *after* the Government rested its case — the defense could have cross examined Mr. Garcia as to those specific days and searched for evidence to show that Mr. Garcia indeed worked on those days. This is precisely the kind of prejudicial sandbagging that the variance doctrine exists to prevent.

Stated another way, based on the Indictment, the defense reasonably believed that the contemplated loss it would have to address at trial concerned whether MBE and WBE were fraudulently obtained from the Port Authority and whether such credit constituted cognizable economic harm. That shifted at the outset of the trial, to the need to address whether that the Port Authority suffered hundreds of millions of dollars of cost overages incurred over years because of the alleged fraud. That then shifted again after the Government rested to whether one person (Johnny Garcia) actually worked on a few days that were reflected in a few thousand dollars worth of certified payroll records.

In sum, we submit that the Government never understood what it had to prove with respect to contemplated economic loss; that contemplated economic loss was not charged at all in the Indictment; and that the trial proof on that issue was so utterly different from the Indictment (and over the course of the trial itself) that it constituted a constructive amendment or

a prejudicial variance.  Accordingly, the case should be dismissed on these grounds as well as the sufficiency and interests of justice arguments made above.

## **CONCLUSION**

For the foregoing reasons, the Defendants' motion for acquittal pursuant to Rule 29 should be granted, the Indictment should be dismissed, or, in the alternative, a new trial should be granted pursuant to Rule 33.

Dated:      October 7, 2016
             New York, New York

Respectfully submitted:

TALKIN, MUCCIGROSSO & ROBERTS, LLP

/s/ Sanford Talkin
By:  Sanford Talkin
Martha Grieco
40 Exchange Place 18th Floor
New York, NY 10005
Tel: (212) 482-0007
*Counsel for Larry Davis*

SHEPPARD MULLIN RICHTER & HAMPTON LLP

/s/ Kevin Puvalowski
By:  Kevin Puvalowski
Sarah E. Aberg
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700

*Counsel for DCM Erectors, Inc.*