UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, | S3 13 Cr. 923 (LAP) |
| v. | |
| LARRY DAVIS and DCM ERECTORS, INC., | |
| Defendants. | |

## REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTIONS OF DEFENDANTS LARRY DAVIS AND DCM ERECTORS, INC. FOR A JUDGMENT OF ACQUITTAL PURSUANT TO RULE 29 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE AND IN SUPPORT OF DEFENDANTS' RULE 33 MOTION FOR A NEW TRIAL

TALKIN, MUCCIGROSSO & ROBERTS, LLP

Sanford N. Talkin
Martha Grieco
40 Exchange Place 18th Floor
New York, NY 10005
Tel: (212) 482-0007

*Counsel for Larry Davis*


SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

Kevin R. Puvalowski
Sarah E. Aberg
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 653-8700

*Counsel for Defendant DCM Erectors, Inc.*

Defendants Larry Davis ("Davis") and DCM Erectors, Inc. ("DCM") (collectively, the "Defendants") respectfully submit this Reply Memorandum in response to the government's Memorandum in Opposition and in further support of their motions pursuant to Rules 29 and 33 of the Federal Rules of Criminal Procedure for a judgment of acquittal for dismissal of the Indictment or for a new trial.

## I. The Trial Evidence Supporting Conviction Was Leally Insufficient Or, In The Alternative, Was So Against the Weight Of The Evidence That The Interest Of Justice Requires A New Trial

### A. The Government Failed To Prove A Fraudulent Misrepresentation

Both at trial and its opposition papers, the government has argued that certain submissions made to the Port Authority should be read to be false by relying on an additional definitional gloss — that documents mentioning an MBE or WBE were allegedly false because the underlying relationship was a so-called "pass-through" or because employees of one company were, according to the government, actually employees of another. The fundamental problem with this approach (and one of the main insufficiencies in the government's case) is that the government's additional definitional gloss is simply not supported by record evidence. Absent the government's unfounded interpretation of the documents, the Defendant's submissions to the Port Authority were absolutely true, both in letter and spirit.

The *only* language in the record applicable to the Defendants' conduct defining what properly constitutes an MBE or WBE is contained in the DCM contracts with the Port Authority. The Tower One contract, for example, provides in relevant part that:

> "Minority-owned business" or "MBE" means a business entity which is at least fifty-one percent (51%) owned by one or more members of one or more minority groups . . . and whose management and daily business operations are controlled by one or more such individuals . . . .

(GX 1 at 6.)  Essentially identical language defines a WBE, (*id.*), and very similar language is contained in DCM's contract for the Transportation Hub, (GX 2C at 1.)

That is the sum total of the record evidence concerning the guidance provided to Defendants on what is or is not properly considered an MBE or WBE.  Despite the government's repeated reliance on the term, there is no definition of "pass-through" in those contracts.  There is zero guidance as to whether or how much the owner must him- or herself actually work on the project; or, if so, how many hours; or what their level of personal experience or expertise, if any, must be; or whether an MBE can hire a non-minority consultant to help oversee the job; or how much on-site supervision, if any, must be done by the owner; or how a joint venture must be managed in order to obtain MBE credit for the minority portion; or what aspects of a joint venture project must be allocated to the MBE entity; or when it is proper to move employees from the payroll of one entity to another.  The government, both at trial and in their opposition papers, have filled in all of those gaps by improperly attempting to bring to bear the Port Authority rules and regulations[1] and by making inferential leaps that are just not supported by the record.

Without these unsupported gap-fillers, one of the government's primary category of misrepresentations — that the mere listing of Solera or GLS as an MBE or WBE was a misrepresentation — completely lacks record support.  Johnny Garcia plainly owned and managed Solera, so listing Solera/DCM JV as an MBE was true, irrespective of whether he himself put in sufficient hours or was personally overseeing the work on-site.  The same is true

---

[1] In its papers, the government continues to rely on the Port Authority rules and regulations despite the fact that they were only admitted at trial as background.  (Gov't's Opp. at 9-11.)  In light of the limited purpose for which it was admitted, it goes without saying that the government cannot properly rely on such evidence to support the sufficiency of evidence supporting the convictions.

of GLS: Gale D'Aloia plainly owned and managed GLS, and thus listing GLS as a WBE was true whether she herself had surveying expertise (which she did in any event).

Another area in which the government repeatedly imposes their interpretation of facts that is unsupported by the record is the repeated suggestion that employees of the Solera/DCM Joint Venture or GLS actually were employees of AC Associates or DCM, respectively, and thus submissions relating to those employees, such as certified payrolls, supposedly are misrepresentations. There is nothing in the record that provides standards as to how this should be judged, however, and the plain meaning of the word employee wholly supports the Defendants' position, not the government's. With respect to the steel work, the record is absolutely clear that the work was conducted by union members who would be hired by different companies job-by-job. That said, it is also clear that the steelworkers on the WTC project had worked for the Solera/DCM JV for many years. For years, those workers were on the JV payroll; they were actually paid by the JV; the JV itself was the signatory to the agreement with the union; the JV bore the legal obligation of paying the workers' salaries and benefits; and the workers were covered by the JV's workers compensation policy. On these facts, by any reasonable definition of the term, the steel workers were actually employees of the JV, and any documents submitted by Defendants (including the certified payrolls) that listed them as such were entirely accurate. The government's argument that the steelworkers were actually employees of AC Associates flies in the face of these uncontested facts. Even though the decking workers had at some point worked for AC Associates and Robert Samella from AC Associates was consulting on the project (a fact, as discussed below, that was fully disclosed to the Port Authority), the steelworkers were both legally and in fact employees of the JV and all submissions stating as much were true.

The same can be said with regard to the surveyors who were moved from the employ of DCM to that of GLS. The record is clear, including from the government's own cooperator, Gale D'Aloia, that the surveyors in reality moved from DCM to GLS. After the move (which, as discussed below, was fully discussed in writing with the Port Authority), those surveyors were actually on GLS's payroll and were paid by GLS; GLS was legally obligated to pay the salaries and benefits; and Gale D'Aloia personally worked to get her employees credentials to work at the WTC site and coordinated the flow of information from the engineers to her surveyors. As with the JV's steelworkers, the government's repeated refrain that the surveyors were actually DCM's employees has no support in the record and is contrary to the general understanding of the word employee.

Given this record, the government's assertions that the Defendants made misrepresentations in the various submissions they made to the Port Authority are not supported. DCM's contracts with the Port Authority required it to use best efforts to hire minority and women-owned subcontractors. DCM did exactly that and did so squarely within the definition contained in its contract. The participation plans listed DCM's goals of using the Solera/DCM JV and GLS (and other MBEs), and there is zero record proof that those goals were not actual goals given the definition of MBE and WBE in the contracts. The statements of payment accurately listed the amounts paid to the Solera/DCM joint venture[2] and GLS. The certified

---

[2] The government suggests that some of the statements of payment are false because they list payments to the joint venture for "deck/studs." (Gov't Opp. at 33.) The government fails to explain how this is false: as discussed above, there is no dispute that the union workers who installed the deck and deck studs were on the joint venture's payroll and were actually paid by the joint venture for many years even before the WTC project.

payrolls accurately list what the workers from each employer were paid.  All of these documents are literally true, and the government cannot demonstrate any misrepresentation.[3]

In its opposition papers, the government makes much of the allegedly "back-dated" joint venture agreements between DCM and Solera, but this suggestion of fraudulent "back-dating" is just not borne out by the record.  Instead, the record shows that Solera and DCM had a written joint venture agreement going back to a project in 2001, (GX 30), and had a generally applicable joint venture agreement since 2004.  (GX 31; TR. 262:23-263:8.)   Mr. Garcia himself testified that Solera and DCM had a joint venture for approximately 13 years,  (Tr. 223:12-13), *i.e,,* for many years prior to the WTC project.  Even according to Mr. Garcia, the only supposedly back-dated documents were the project-specific joint venture agreements relating to Tower One and the Hub, (Tr. 264:21-21), which are substantially the same as the agreements that had been in effect between Solera and DCM for years.  (*Compare* GX 31 (general JV agreement from 2004) and GX 32 (JV from the WTC-1 project)).  Any suggestion by the government that the joint venture itself or the written agreement reflecting the joint venture was created in order to trick the Port Authority is simply belied by the record.

### B.      The Government Failed To Prove An Intent To Defraud The Port Authority

---

[3] As we argued in our moving papers, even if the government had proven some misrepresentation, it completely failed to prove that whoever drafted and submitted those documents had any knowledge of such falsity or an intent to defraud the Port Authority.  In response, the government argues that this failure is somehow excused because the Defendants stipulated to the authenticity of the documents and did not object to their admission as business records.  (Gov't Opp. at 30, 34.)  This argument is a complete non-sequitur:  the fact that a proposed government exhibit is a true and accurate copy of a corporate document says nothing about the knowledge or intent of the corporate employee who drafted and submitted that document, and nothing in the language of the stipulation logically or legally concedes anything other than authenticity and that a hearsay exception applies.  Frankly, the fact that the government is trying to squeeze some sort of further admission out of a standard-language business record and authenticity stipulation is amplifies the inadequacy of their position.

Application of the wire fraud statute has been "repeatedly rejected where the purported victim received the full economic benefit of its bargain," and there has been no showing that "the deceit affected the victim's economic calculus or the benefits and burdens of the agreement[,] . . . the defendants' misrepresentations pertained to the quality of services bargained for[,]" or exposed the victim to "unexpected financial risk." *United States v. Binday*, 804 F.3d 558, 570-71 (2d Cir. 2015). In its opposition, the government continued in their failure to articulate how the Port Authority suffered economic harm or how such harm was contemplated by the Defendants. The record clearly shows that the Port Authority received the full economic benefit of its contracts with DCM and the evidence is thus insufficient to show fraudulent intent.

In the Indictment and at trial, the government tried to show contemplated economic harm in three different ways. First, the theory of harm alleged in the Indictment was that the Defendants "falsely claimed" MBE credit in excess of $70 million (Indictment ¶ 12), and "falsely claimed" $6.3 million in WBE credit, (Indictment ¶ 15). The Port Authority witnesses, however, made clear that the provision of MBE and WBE credit by the Port Authority did not in any way cause the Port Authority any economic harm or affect the economic benefit of the bargain or cause any unexpected financial risk. Instead, as Ms. Perich testified, her office monitors the "MBE effort," (T 88:14-89:11), and compiles the data into an annual report for the Port Authority Board of Directors regarding "how well the agency met its commitment of contracting 12 percent with minority-owned businesses and 5 percent with women-owned businesses." (T 89:5-11.) She articulated no actual or possible economic effect whatsoever for the provision of the allegedly fraudulent MBE or WBE "credit."

Second, the government asserted that the payments made to Solera and GLS somehow caused DCM to fail to complete the project for the originally contracted price, and thus the

additional payments made by the Port Authority could be attributed to the alleged fraud.  Hitting the buzzwords without much explication, the government argues in its opposition papers that the allegedly fraudulent payments to Solera and GLS "deprived the Port Authority of valuable information to make an informed economic decision" and "exposed the Port Authority to undisclosed economic risk."  (Gov't Opp. at 37.)  The problem with these arguments are unsubstantiated in the trial record and were also thoroughly destroyed by a Port Authority witness, Alan Reiss:  on cross examination, Mr. Reiss clarified the true reason for these extra costs — namely, that the Port Authority asked DCM and Davis to perform *extra* work outside the scope of original contract.  (T 184:1-21.)  Indeed, on redirect examination, Mr. Reiss actually identified the precise causes of the extra work needed:  the Port Authority's requested changes to the building plans, construction delays, bad weather (including record snowstorms and Hurricane Sandy), redesign of the 9/11 Memorial, issues with the intumescent paint, and delays in getting curved steel from a vendor in Europe.  (T 210:6-211:18.)  There was no suggestion that any of these extra costs were linked to DCM's MBE or WBE goals, or to any alleged misrepresentations regarding those goals.  Mr. Reiss also testified that DCM completed the work it was hired to do, and that "DCM was building the building satisfactorily."  (T 184:22-23; T 188:25-189:9.)

The government in its papers relies on an argument that the jury could have reasonably inferred that the allegedly fraudulent payments contributed to DCM not being "able to complete the projects for the prices contracted for."  (Gov't Opp. at 37.)  Such an inference, however, simply cannot be reasonably made here:  the *only* evidence presented to the jury as to the reason for the additional costs was the testimony of Mr. Reiss, and he was explicit in explaining that the extra costs were the result of extra work being required by the Port Authority for reasons that had

nothing whatsoever to do with payments made to Solera or GLS. On this record, drawing a conclusion contrary to what Mr. Reiss said about the reasons for the extra costs would not constitute a reasonable inference, but rather plainly improper speculation.[4] Stated another way, the government put on exactly one witness who testified about the reasons for additional payments that the Port Authority made beyond the original contract prices, and that witness testified unequivocally that such payments were for reasons other than the allegedly fraudulent payments — the government cannot now just ignore that inconvenient testimony and argue the opposite.

The government's final theory of economic loss is that the alleged fraud caused actual economic harm because Johnny Garcia himself was paid a few thousand dollars on certified payrolls. Putting aside, for the moment, that this argument represents a further dramatic change to the government's loss theory and was never raised by the government until *after* it had finished its case, the record once again does not support the claim in any event. Although the government claimed in its opening that Johnny Garcia did no work at all, that claim is squarely belied by the record. Among other things, Mr. Garcia exchanged numerous emails with steel suppliers in Spain and himself travelled to Spain to engage in meetings regarding the steel being manufactured there. Mr. Garcia was actively involved in the testing of the prismatic glass that

---

[4] At the outset of the projects, both of the relevant contracts were fixed price contracts, and thus any payments (fraudulent or not) made to Solera and GLS would not have had any impact on how much the Port Authority was paying. With respect to the extra work that generated additional costs, the record is clear that such costs, which did not include overhead expenses to DCM, Solera or GLS, were reviewed in great detail and were paid only after the costs had been examined and approved in the context of court proceedings after DCM and other contractors sued the Port Authority in New Jersey state court. In sum, for the contracted work, any allegedly fraudulent payments made to Solera and GLS would have come out of DCM's pocket, not the Port Authority's; with respect to the extra work ordered by the Port Authority, the record demonstrates that all payments were thoroughly vetted and proper and there is no proof whatsoever that there were any improper payments made to Garcia or D'Aloia.

would have been installed on the first 20 floors of Tower 1 and himself went to China to participate in the testing of that glass, testing that resulted in the cancellation of that aspect of the project (Mr. Garcia himself videotaped the testing). Mr. Garcia also travelled to Pittsburgh and New Jersey. There is nothing in the record to suggest that the few certified payrolls at issue did not relate to one of the many days when Mr. Garcia was concededly on site or doing some activity related to the project. Perhaps more to the point, the entire theory of improper payments to Solera was that Solera invoiced and was paid for work done by non-minority firms, not that Mr. Garcia was personally paid for his own time improperly; indeed, Mr. Garcia did not testify that he received money fraudulently through certified payrolls. There is a complete lack of evidence that those few certified payrolls that included Mr. Garcia's name on them were in any way false.

On this point, the government in its opposition papers has made another interesting shift in its position. After opening on the assertion that Mr. Garcia did not work whatsoever on the WTC project, a claim that the record evidence just does not support, the government in its opposition repeatedly asserts that Mr. Garcia "did no construction related work" on the project. (Gov't Opp. at 31, 33, 39.) Although that assertion could be debated given the evidence that he was involved directly and repeatedly in the procurement of steel from Spain, Pittsburgh and New Jersey, and glass from China, among many other things that were elicited on cross, the fact is that there is no requirement, anywhere that Mr. Garcia had to himself do any "construction related work." Under DCM's contract with the Port Authority, so long as Mr. Garcia owns 51% of his company (which he did) and controls the "management and daily business operations," MBE credit is appropriate. (GX 1 at 6.) Under this definition (which is, again, the only guidance in the record given to DCM on what a proper MBE is), Mr. Garcia does not need to

himself swing a hammer, or himself operate machinery, or even be on site; so long as he can fairly be viewed to be managing his own company, he himself could theoretically do so by phone from the beach. In any event, the fact is that Mr. Garcia managed Solera and was himself engaged in various project-related tasks, including dealing with suppliers and even travelled to Spain and China to manage that process.

There is another point here. On direct examination, each cooperator parroted the "I did no work" line. On cross examination, however, as detailed in defendants' motion, it became clear that each cooperator wrote dozens of emails, approved and signed orders, made business decisions, and interfaced with the Port Authority and with the construction workers on site on numerous occasions. Pivoting, the government then explained that all of this work was not real but was done to create a "paper trail" to "cover up" the fraud: that each email written, security clearance negotiated, and trip to visit suppliers was merely "fake" work designed to mislead the Port Authority into believing the companies were real. "Fake work" would have been if the many emails Garcia sent to the steel contractor in Spain were not really sent, or if someone else actually wrote them under Garcia's name. But it was clear from Garcia's own testimony that Garcia actually wrote those emails, and that the receiver of the emails acted on them, and that the Spanish contractor was not "in on" the fraud. Irrespective of whether the intent was to actually do the work, as Defendants contend, or rather to do work to keep up appearances, the work was actually done, and the Port Authority was not defrauded.

## II. The Record Demonstrates Defendants' Good Faith

In our moving papers, Defendants went over all of the various ways in which the Defendants acted in good faith, including by disclosing many of the very details of how it was dealing with the MBEs and WBEs that the government now claims show a fraudulent scheme.

Defendants did not hide the fact that AC Associates was involved in the project as a project manager; indeed, in November 2009, AC Associates submitted a form to the Part Authority monitor confirming that it was providing project management services. (Ex. S-100.) The fact that Solera and DCM were not strictly following the joint venture agreement was no secret, in fact, Mr. Davis specifically told a representative of the Port Authority in 2009 that Mr. Garcia's could not afford to share in the losses notwithstanding the JV agreement. (Ex. S-203.) And the entire arrangement to move the surveyors from DCM's payroll to GLS's — the core of the alleged GLS part of the fraud — was discussed in detail in a letter sent by DCM to the Port Authority in December 2009. (Ex. S-102.) In sum, in their opposition papers, the government essentially ignored the facts that DCM and its alleged co-conspirators disclosed major portions of what the government at trial claimed was part of the fraudulent scheme.

Instead of addressing the facts that show good faith, the government in its papers pointed to other facts that supposedly show falsity or bad intent. Each of these arguments, however, does not withstand scrutiny and often suffers from the unjustified jaundiced gloss that is discussed above. The government, for example, points to the evidence concerning Goldman Sachs and the New York Times Building that was admitted under FRE Rule 404(b). The fact that the Defendants engaged in similar conduct before is not by itself evidence of anything, in fact it could very well indicate that the Defendants had believed that they were doing things correctly both with the prior projects and at the WTC. Indeed, that view is squarely supported by Ms. D'Aloia's testimony and subsequent actions. According to Ms. D'Aloia, Mr. Davis suggested that because she had a background in engineering and drafting, she could manage that portion of the Goldman Sachs contract in addition to payroll, and Ms. D'Aloia agreed, hoping to use the experience to gain certification as a WBE for drafting and engineering. (T 685:24-25.) Ms.

D'Aloia testified that she actually intended to manage the drafting and engineering work at Goldman Sachs when she began the venture and was confident that she could handle it. T686:11-14; T697:14-19. She testified that that was her understanding of Mr. Davis' intentions as well. T766:2-10. She testified that the drafting work at the WTC sites entailed thousands of drawings, and that she managed the communication among ASDA, ASDA's own subcontractors, the architects and the owners. T736:14-25 – T737:1-15. Given not only her engineering background, but also her history with the people at ASDA going back 30 years, Ms. D'Aloia was an ideal person to manage this aspect of the work. T738:3-14.

The fact that Ms. D'Aloia did not think there was anything wrong with this work was shown when in 2009 Ms. D'Aloia guilelessly told the representative who identified himself as from the Port Authority — the agency the Government claims Ms. D'Aloia was deliberately conspiring to defraud — that she subcontracted out all of the drafting and engineering work to ASDA. (Def. Ex. D10; T 800:17-25.) Indeed, on cross examination, Ms. D'Aloia confirmed that until she was convinced to the contrary by the government, she thought that everything she was doing was entirely legal. T809:15-810:19. This record does not indicate bad intent with regard to the Goldman Sachs job, but rather good faith.

The government also points to various documents that Mr. Davis signed; these documents also do not show fraudulent intent. The government points to the Solera/DCM joint venture agreement application. The application, the Defendants submit, is not false, and the fact that the joint venture agreement was not strictly followed between Solera and DCM was not a secret, as discussed above. Similarly, the government's citation to a SAR that represented that Solera/DCM would install the decking (Gov't Opp. at 41) was absolutely true: as discussed in detail above, the union decking crew were employees of the joint ventures for years; they were

actually on the JV payroll and were paid by the JV.  The SAR saying as much was true in letter and in spirit.

The government next points to evidence supposedly showing that Johnny Garcia and Mr. Davis took steps to beef up Solera's capabilities, steps that the government claims were all part of a giant cover up to make it look like Solera had more involvement in the project.  This included emails showing that Johnny Garcia himself was sending emails to and dealing with vendors and the hiring of Bill Cooper[5] and others.  As discussed in detail in our moving papers, these acts show good faith, not bad intent:  there is no dispute that Johnny Garcia hired additional project managers, including Javier Ronquillo; there is no dispute that Johnny Garcia drafted and sent real emails to steel suppliers and other third parties; there is no dispute that Mr. Garcia's niece coordinated with the supplier in Spain; there is no dispute that Bill Cooper generated detailed reports for Johnny Garcia keeping him informed of the engineering progress and procurement.  All of that work was actually done.  It actually related to the project and those employees were actually paid by Solera.  Defendants submit that this record is far more consistent with an increased effort to ensure MBE compliance, and thus the Defendants' good faith, than an effort to cover up some MBE fraud.  In any event, the work was actually done by Mr. Garcia and his employees, so there is no fraud irrespective of what the intention was.

Finally, the government points to the body wire recording.  In discussing the recording, however, the government both overstates the comments that supposedly show a bad intent and understates explicit language about Mr. Davis's non-criminal intent.  Defendanta submit that the

---

[5] The fact that Mr. Cooper lived in Canada and worked out of DCM's offices does not suggest that his hiring by Solera was a sham:  the whole point of his addition was to provide Johnny Garcia and Solera a point person in Canada where the engineering and lots of other administrative work was occurring.

conversation must be viewed as a whole and that as a whole the tape plainly and specifically demonstrates that Mr. Davis did not believe that what Defendants were doing was wrong. The government primarily points to a statement made by Mr. Davis about pass-throughs: "criminal is pass-through . . . if you represent yourself as a minority business . . . and you're not involved in the business and don't have the knowledge of the day to day work . . . that's criminal." (GX-101T.) Far from being some admission, however, the record shows that that is *not* what was happening with Solera, and in the remainder of the tape Mr. Davis makes numerous express statements that he does not believe what they are doing falls within the pass-through definition. During the discussion, for example:

- Mr. Davis expressly discussed sending a letter to the Port Authority explaining that they would be moving employees from the Solera payroll to the joint venture's payroll due to lack of payment. (GX 100T at 1-2.)

- Mr. Davis told Mr. Garcia that the purpose of the lawyers is to make sure that we are going down the right road. (GX 100-T at 3.)

- Mr. Davis noted that Horace Flowers was going to be sending a note to the minority compliance officer and that Mr. Flowers has been working with Mr. Garcia for a couple of years. (GX 101T at 1.)

- Mr. Davis denied that Bob Samella from AC Associates was running the job; rather he was consulting and being paid for providing estimates and advice. (GX 102T at 1.)

- Mr. Davis explicitly suggested that the government's views on MBE compliance were changing: "now it's wrong." (GX 103T at 2.)

- Mr. Davis stated that there was nothing wrong with the joint venture. (GX 104T at 2.) The Port Authority could discredit it if it takes that position, but "we're not saying anything wrong" and "that's not a crime." (*Id.*)

- Mr. Davis confirmed that "all the decking guys are Solera DCM always," and that AC Associates was a consultant. (GX 104T at 7-8.)

- Mr. Davis stated that the Port Authority would be advised that Solera cannot keep their guys on site because of the Port Authority's failure to pay. (GX 104T at 9.)

- Mr. Davis explicitly described that there is a disagreement with the government as to whether DCM had operated a pass-through and stated that it was not a pass-through despite the government's opinion. (GX 105-T.)

- Mr. Davis stated again that there's nothing criminal and that fees paid to Solera are advances on anticipated profits, advances that Solera could not survive without. (GX 107 at 1-2.) Mr. Davis went on to note that the government might disagree with that, but that "doesn't make them right." (*Id.*)

- Mr. Davis confirmed again that the Port Authority was aware that AC Associates was a consultant on the project." (GX 108 at 2.)

In sum, during a conversation in which Mr. Davis was not aware he was being taped, he stated repeatedly and consistently that he believed that the MBE arrangement with Solera were proper and legal, notwithstanding that the government was already investigating and was taking a different view. Far from showing a bad intent, the tape is explicit in demonstrating that Mr. Davis was acting in good faith. Moreover, the tape, like the documentary record brought out on cross examination of Mr. Garcia, shows definitively that not only was Mr. Garcia directly involved in managing Solera's business, but that Solera employees were active on the project

and would be moved onto the joint venture payroll in order to get them paid. Thus, the tape, when examined in the context of the entire recording, not only provides clear, contemporaneous evidence that Mr. Davis had no fraudulent intent and was acting in good faith, but also serves as further evidence that Mr. Garcia's testimony that he and Solera did no work on the project was utter nonsense.

## III. Sufficiency of the Indictment/Constructive Amendment And Prejudicial Variance

### A. The Indictment Failed To Allege An Intent To Defraud

As discussed in detail in Defendants' moving papers, the Indictment failed to allege the core of the intent to defraud prong of wire fraud because it failed to allege that the Defendants intended to cause economic harm to the Port Authority. The government's argument that this argument was waived because it was not made before trial is without merit: the law is clear that a defendant is not bound by the deadline expressed in Rule 12(b) of the Federal Rules of Criminal Procedure if the defendant would not have been aware of the deficiency until trial. *See United States v. Sturdivant,* 244 F.3d 71, 76 (2d Cir. 2001) (rejecting waiver in duplicity context: "Thus, we will not find a defendant has waived a duplicity argument where the claimed defect in the indictment was not apparent on its face at the institution of the proceeding."); *United States v. Brothman,* 191 F.2d 70, 72 (2d Cir. 1951) (rejecting waiver in the venue context where the defendant "could not know that venue would not be proved until the prosecutor's evidence was closed; he then moved for a directed verdict.").

Here, the Indictment alleges that the Defendants fraudulently obtained MBE and WBE credit and couched it in economic terms, quantifying the credit in the millions of dollars. When Defendants asked the government for a limited bill of particulars disclosures, the government did not give details but stated that the Port Authority was the victim of the alleged fraud scheme. It

was not until at trial, after the Port Authority witnesses testified that it became clear that the alleged fraudulent "credit" caused no economic harm and indeed had no economic impact whatsoever. Once this became clear, the Defendants promptly made this argument part of its motion at the close of the government's case.[6] The detail that a criminal defendant gets about what government witnesses will say about a topic is thin, to say the least. Defendants here had no way of knowing what the Port Authority witnesses would say about the economic effect of providing MBE and WBE credits. The government alleged in the Indictment the credits caused economic harm and Defendants had no means, or ability to, refute that claim prior to hearing the evidence at trial. Finding a waiver under these circumstances would be unreasonable and contrary to clear precedent.

Moving on to substance, the government in its opposition papers does not explain how the Indictment alleges an intent to cause economic harm. The allegedly fraudulently obtained MBE and WBE "credit" has no economic effect, as confirmed by the Port Authority itself. Significantly, none of the other theories of loss articulated by the government at trial appears in any way shape or form in the Indictment: there is no allegation that the improper credits caused additional payments; nor is there any allegation of fraudulent certified payrolls. Nothing in the Indictment alleges an intended economic harm, and thus the Indictment is insufficient and should be dismissed. *See United States v. Pirro*, 212 F.3d 86, 91 (2d Cir. 2000) ("A criminal defendant is entitled to an indictment that states the essential elements of the charge against him.") (citing *Jones v. U.S.*, 526 U.S. 227, 232 (1999); *Hamling v. United States*, 418 U.S. 87, 117 (1974)).

---

[6] The government erroneously claims that Defendants made this motion "months after trial." (Gov't Opp. at 46.) This is just plain wrong: Defendants included a challenge to the sufficiency of the Indictment in its letter to the Court dated August 8, 2016, submitted in connection with their Rule 29 motion. (See 8/8/16 Letter at 5.)

### B. The Government's Shifting Theories Constituted Constructive Amendment And/Or Prejudicial Variance

Defendants entered trial believing, based upon the Indictment and the *in limine* motion practice that the government's theory of economic harm was based on fraudulently obtained MBE and WBE "credits." During the government's opening, however, for the first time the government laid out a theory that the alleged fraud somehow caused the Port Authority to pay over $100 million of extra payments. This complete shift on a core issue in the case constituted a constructive amendment of the Indictment: it was not alleged in the Indictment, and, as far as Defendants are aware, was never presented to the grand jury. *See United States v. Salmonese,* 352 F.3d 608, 620 (2d Cir. 2003) ("To prevail on a constructive amendment claim, a defendant must demonstrate that either the proof at trial or the trial court's jury instructions so altered an essential element of the charge that, upon review, it is uncertain whether the defendant was convicted of conduct that was the subject of the grand jury's indictment.") (quoting *United States v. Frank*, 156 F.3d 332, 337 (2d Cir. 1998); *see also United States v. Laspina*, 299 F.3d 165, 181 (2d Cir. 2002).

This shift also very substantially prejudiced the Defendants' ability to defend against this new claim. Had this assertion been alleged or otherwise brought to the Defendants' attention, the Defendants would have had time to obtain and analyze all of the materials relating to payments for extra work, including the various filings, decisions and agreements that related to the state court proceedings on this very topic that occurred in New Jersey. The fact that the Defendants were able to scramble and obtain important concessions from Mr. Reiss on cross examination to show that the extra payments made to DCM were for additional work outside the contract scope does not mean that the Defendants suffered no prejudice. With sufficient notice, we could have opened on this issue and could have proven up through documents that the extra

payments made were the result of extra work that was requested (as Mr. Reiss testified) and not the government's assertion that the extra payments were in part due to payments made to Solera and GLS.

That was not the last major shift in the government's theory of loss, however. Perhaps realizing that their additional payment theory was destroyed by Mr. Reiss's testimony, the government in closing (and in the current motion) relied on a theory, for the first time, that several of the certified payroll records reflected payments of a few thousand dollars made to Johnny Garcia for his own time working on the project. This was never alleged and, to the best of Defendants' knowledge, was never presented to the grand jury. This shift also greatly prejudiced the Defendants: had Defendants been aware that the government would attempt to show economic loss by these few hours of work, we would have analyzed Mr. Garcia's schedule on the days in question in an attempt to show that the certified payrolls accurately reflected actual work, such as when Mr. Garcia was dealing with suppliers via email or travelling the world to meet with them. Not only did we never have that opportunity to analyze the evidence on this point, but because the government did not raise this issue until after it rested its case. As a result, Defendants were unfairly deprived of the opportunity to open on this issue or even cross-examine Mr. Garcia with respect to those certified payrolls.

The fact is, the government repeatedly and very substantially moved the goal posts with respect to economic harm: they alleged that loss was based on fraudulent credits; when they realized that that theory was not going to be supported by their own witnesses, they shifted to a new theory that the alleged fraud caused millions of dollars of additional payments; when that theory was wholly contradicted by Mr. Reiss, they pointed to something completely new, that Mr. Garcia's name appeared on a few certified payrolls, something they had never even

mentioned before resting their case. Whether viewed as a constructive amendment (and there is no evidence that the grand jury considered the new theories in any respect) or as a prejudicial variance, the shifts were Constitutionally deficient, deprived Defendants of fair notice and the ability to prepare a defense thus requiring dismissal of the Indictment.

## <u>CONCLUSION</u>

For the foregoing reasons and the reasons articulated in prior briefing and argument, the Defendants' motion for acquittal pursuant to Rule 29 should be granted, the Indictment should be dismissed, or, in the alternative, a new trial should be granted pursuant to Rule 33.

Dated:      New York, New York
              January 23, 2017

Respectfully submitted:

TALKIN, MUCCIGROSSO & ROBERTS,
  LLP

*Sanford Talkin*
By: Sanford Talkin
Counsel for Larry Davis

SHEPPARD MULLIN RICHTER &
HAMPTON LLP

*Kevin Puvalowski*
By: Kevin Puvalowski
Counsel for DCM Erectors, Inc.